[Cite as *In re D.B.*, 2024-Ohio-377.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 23CA1176 |
| D.B. | : | |
| A.S. | : | |
| A.B. | : | <u>DECISION AND JUDGMENT</u> |
| K.B. | : | <u>ENTRY</u> |
| R.B. | : | |
| | : | **RELEASED: 01/24/2024** |

_____

<u>APPEARANCES:</u>

Brian T. Goldberg, Cincinnati, Ohio, for appellant.

Aaron E. Haslam, Adams County Prosecutor, West Union, Ohio, for appellee.

_____

Wilkin, J.

{¶1} Appellant, Alexandrea Carey, appeals a decision of the Adams County Court of Common Pleas, Juvenile Division, that overruled appellant's objections to the magistrate's decision and granted Adams County Children's Services ("the agency") permanent custody of her five children: D.B., A.S., A.B., K.B., and R.B. Appellant raises one assignment of error that asserts that the trial court's decision to place the children in the agency's permanent custody is against the manifest weight of the evidence. After our review of the record and the applicable law, we do not find any merit to appellant's assignment of error. Therefore, we affirm the trial court's judgment.

FACTS AND PROCEDURAL BACKGROUND

{¶2} In April 2017, the agency became involved with appellant and the two children she had at the time: A.B. (then, about one and one-half years old) and A.S. (then, about seven months old). The agency had concerns with appellant's homelessness, her ability to provide for the children's basic needs, and her mental

health.  A.B. and A.S. were in the agency's temporary custody for six months, after which the trial court returned the children to appellant's custody.  Around that same time, appellant gave birth to a third child, D.B.  The agency continued to work with appellant until the case closed on July 9, 2018.[1]

{¶3} Less than a year later, on May 15, 2019, the agency filed complaints that alleged A.B. (born September 7, 2015), A.S. (born August 22, 2016), and D.B. (born October 15, 2017) to be dependent children.  The complaints asserted that appellant has failed to comply with a voluntary case plan, is not attending counseling, and is not taking prescribed medications.  The complaint further averred that appellant's mother is living in the home, even though a domestic-violence incident had occurred between appellant and her mother while the children were present.  The agency requested the court to grant it protective supervision of the children.

{¶4} On June 19, 2019, the magistrate adjudicated the three children dependent and placed them in the agency's protective supervision.  On September 4, 2019, the court entered a dispositional order that continued the children in the agency's protective supervision.

{¶5} The agency developed a case plan for appellant that required her to continue mental-health counseling and to take all prescribed medication.  The case plan additionally included appellant's mother and required appellant and her mother to "practice safe and healthy ways to cope with every day stress around them" and to participate in family counseling.  The case plan further noted that neither appellant nor her mother appeared able to control the children's behaviors.  The case plan thus

---

[1] The 2017 records are not part of the record transmitted on appeal.  This information is recounted in one of the exhibits that the trial court admitted during the permanent-custody hearing.

required both to attend parenting classes, to learn age-specific ways to discipline the children, and to learn appropriate methods of addressing behavioral difficulties.

{¶6} In February 2020, the agency recommended that the court terminate the protective-supervision order. The agency stated that "all case plan objectives have been completed and there are no current concerns or active safety threats in the home." On February 26, 2020, the court terminated the protective-supervision order.

{¶7} The next month, appellant gave birth to K.B. (born March 11, 2020).

{¶8} About one year later, on March 2, 2021, the agency asked the court to reinstate the protective-supervision orders for A.B., A.S., and D.B. The agency asserted that it had received a report that A.B. may have been sexually abused by two individuals appellant had associated with or allowed to live in her home. The agency indicated that in November 2020, appellant had filed protection orders against both individuals. However, on January 25, 2021, one of the individuals had returned to appellant's home. Appellant later admitted that she had allowed one of the suspected perpetrators to return to her home.

{¶9} On that same date, the agency filed a complaint that alleged K.B. is a dependent child. The agency sought protective supervision of K.B.

{¶10} On March 30, 2021, the agency filed an ex parte motion that asked the court to place the four children in its temporary custody. The agency stated that it had received information that "there are individuals residing in the home and one child has alleged physical abuse occurring by one or more of the individuals." The agency further alleged that appellant "continues to fail to provide adequate care for the children and repeatedly allows numerous individuals to stay in her home and to stay alone with the

children." That same day, the court granted the agency temporary custody of the children.

{¶11} On March 31, 2021, the court held a shelter-care hearing. The guardian ad litem (GAL) stated that she recently interviewed the three older children. Of note, during her interview with A.S., A.S. reported that a person named Michael "is mean to her and hurt her." The GAL asked A.S. where this person hurt her, and A.S. "pointed to her vaginal area." A.S. stated that this individual does not live in the home, but he sometimes visits. A.S. additionally recounted "that someone that she calls daddy drags her up the stairs by her hair." The GAL emphasized that A.S. mentioned "several times during the interview that she had been drug up the stairs by her hair."

{¶12} Caseworker Michael Tomlin testified that the agency initially had a protective-supervision order in place to help appellant be able "to protect the children from men coming into the home." After learning about the GAL's recent interview with A.S., the agency asked the court to remove the children from appellant's home. Tomlin explained that at the time, A.S., D.B., and K.B. were at the courthouse, but A.B. was not. Tomlin stated that he and a sheriff's deputy went to the grandmother's home to attempt to locate A.B., but the grandmother stated that appellant had taken A.B. Tomlin reported that appellant removed the child even though she already had been served with the ex parte order that granted the agency temporary custody of the children.

{¶13} Tomlin indicated that on the day of the shelter-care hearing, an agency caseworker advised appellant that she needed to bring A.B. to the hearing, and appellant stated that "she would absolutely not do that." Tomlin stated that appellant eventually gave an address where the agency could locate A.B.

{¶14} On March 31, 2021, the court confirmed its order placing the children in the agency's temporary custody.

{¶15} The agency developed a case plan aimed at reunification. The case plan noted that D.B. has been diagnosed with autism and that A.S. is awaiting an autism evaluation. The case plan thus required appellant to "participate in parenting classes to enhance her parenting skills and knowledge for dealing with her children's autistic needs." The case plan further required appellant to attend mental-health counseling and to prohibit "alleged perpetrators in her home or around the children at any time."

{¶16} On May 28, 2021, the court adjudicated K.B. dependent and continued the child in the agency's temporary custody.

{¶17} On June 3, 2021, the court entered a dispositional order placing K.B. in the agency's temporary custody. The court also continued the three older children in the agency's temporary custody.

{¶18} On September 1, 2021, the court filed a review-hearing entry. The court noted that at the review hearing (it has not been transcribed and submitted to this court), Tomlin testified that appellant had filed another protection order against one of her paramours, which was a repeating pattern of behavior. Appellant also became pregnant with her fifth child. Additionally, appellant had allowed two individuals into her home, and these individuals sexually abused two of appellant's children. The court found that appellant continues to place the children in harm's way. The court explained:

> She is involved with other adults who also have ongoing involvement with CPS. She continues to make poor choices when it comes to her paramours, is again pregnant, and none of her children have the same father, establishing a pattern of unstable relationships. The current babysitter she is using has a CPS history. [Appellant] stated that it was not her business to ask the babysitter questions about her background. The Court finds that

[appellant]'s lack of discretion and judgment is a present risk of harm to the safety of the children.

The court continued the children in the agency's temporary custody.

{¶19} On April 4, 2022, the agency filed a complaint that alleged R.B., born March 21, 2022, is a dependent child. The agency requested protective supervision. On May 27, 2022, the court adjudicated R.B. a dependent child and placed him in the agency's protective supervision.

{¶20} On August 24, 2022, the court returned the four older children to appellant's custody and granted the agency protective supervision.

{¶21} On November 16, 2022, the court filed a review-hearing entry. The court noted that at the review hearing (it has not been transcribed and submitted to this court), the GAL stated that the children have been missing "significant amounts of school." Additionally, A.S. had "appeared at school with bruising," and she stated that another child in the home had caused the bruising. The court maintained the protective-supervision order.

{¶22} On January 13, 2023, the GAL filed a request for the court to schedule the matter for a hearing. The GAL stated that appellant has been evicted from her apartment and must vacate the premises by January 17, 2023. Appellant stated that she and the children can stay with a family member in Indiana, but the GAL does not have any information about this family member. Appellant stated that she planned to live in a homeless shelter until she can move out of the state. School personnel also relayed some information to the GAL that caused her concern. The school had sent her a photo of A.S.'s "hair that appeared to be balding in spots and matted together." The children also had unexcused absences.

{¶23} On January 13, 2023, the court entered an ex parte order that placed the five children in the agency's temporary custody. In the order, the court noted that the GAL had requested a hearing, and the court recounted the testimony from that hearing (it has not been transcribed and submitted to this court). At the hearing, the GAL testified that the children had been missing "significant amounts of school." Additionally, an individual at A.S.'s school noted that A.S. had bruises, and A.S. reported that another child in the home had caused those bruises.

{¶24} On January 17, 2023, the court held a shelter-care hearing. The court found that the children have unexcused absences from school and that K.B. has "unexplained bruising." The court continued the children in the agency's temporary custody. The court further ordered K.B. and A.S. to be interviewed at the Mayerson Center for Safe and Healthy Children.

{¶25} On February 15, 2023, the agency filed motions that requested permanent custody of the five children.

{¶26} On that same date, the court entered a review-hearing entry. The court noted that the two children had undergone forensic interviews and that the result of this interview "presents more concerns regarding [appellant's] parenting of the children."

{¶27} On June 7, 2023, the magistrate held a hearing to consider the agency's permanent-custody motions. Tomlin testified that the children were removed from appellant's home in March 2021 due to allegations of physical abuse. Tomlin stated that appellant failed to provide adequate care for the children and "allowed numerous individuals to stay in her home and stay alone with the children." In August 2022, the children were returned to appellant. Tomlin explained that in January 2023, the agency

learned that appellant was losing her housing and that the children were missing multiple days of school. Thus, the agency again sought temporary custody of the children.

{¶28} Tomlin reported that the four older children currently live in a foster home, and R.B. lives with a relative. He stated that the children are doing well in their current placements. They "seem like they're happy," and "they've made a lot of progress." When Tomlin meets with the children each month, the children state that "they like being" in the foster home, but they would like to be placed with appellant. Tomlin testified that adoption is possible if the court grants the agency permanent custody of the children.

{¶29} Tomlin stated that the children are doing well socially and emotionally, and the children's medical needs are being met. He further explained, however, that the agency encountered problems when trying to schedule an appointment for D.B., who is autistic. Tomlin indicated that due to staffing shortages, the agency has not been able to find a therapist for D.B. Tomlin stated that he contacted an agency, "ABA Therapy," at least once each month to try to find a provider. He asked for a list of other providers, but he has not received a response yet.

{¶30} Tomlin also reported that D.B. needs to wear eyeglasses for a "lazy eye." If D.B. does not wear the glasses, then he will need surgery to correct the issue. However, D.B. has not been wearing his glasses for the past month because he broke them in half and threw them away. Tomlin explained that D.B. needs an appointment to receive a new pair.

{¶31} Tomlin indicated that A.S. and A.B. receive mental-health counseling for their anxiety disorders and posttraumatic stress disorders (PTSD).  The two children have these diagnoses due to events that occurred while living with appellant.[2]  A.S. and A.B.'s counselor believes that they "are doing really well" and reported that A.S. is not "wild and rambunctious like she was."

{¶32} Tomlin agreed that while in the agency's temporary custody, A.B. suffered a hairline fracture to her arm.  However, no one offered any testimony to explain the circumstances that resulted in this fracture (i.e., accidental or intentional).

{¶33} Tomlin explained that appellant's case-plan goals required her to take parenting classes, to learn how to manage D.B.'s behaviors, to protect the children, and to maintain a stable home.  Appellant currently lives with her mother, Barb.  The agency did not approve Barb's home as a placement for the children due to physical abuse involving A.S. and A.B.

{¶34} Tomlin agreed that appellant complied with parts of her case plan, but he still has concerns about appellant's ability to maintain a stable home for the children, to meet their basic needs, and to keep inappropriate individuals away from the children. Tomlin does not believe that appellant would be able to provide the children with their basic needs due to her lack of stability in maintaining housing and employment and in keeping the children away from individuals who may be harmful.

{¶35} Tomlin stated that appellant does not currently have a stable home for the children.  Appellant reported that she had a place in Indiana where she might be able to

---

[2] Other than the general sexual and physical abuse allegations, the record does not contain any information about the events that resulted in these diagnoses.

stay.  However, at the time of the hearing, appellant was staying with her mother.

Moreover, appellant did not give Tomlin an address for the Indiana residence.  He

asked appellant for the address, and appellant stated that the GAL had it.  Tomlin had

not yet had a chance to contact the GAL to obtain the address.

{¶36} Tomlin indicated that appellant reported that she had a job at a Speedway

store, but she took a leave of absence so that she could help take care of her mother.

{¶37} The GAL testified that when the children returned to appellant's custody in

August 2022, things seemed to be fine until November 2022, when the school contacted

her to report that the children "were missing significant amounts of school" and had

concerns about the children's wellbeing.  The school reported that A.S. "was missing

chunks of hair" and "had bald spots."  The GAL later learned that appellant was being

evicted.

{¶38} The GAL stated that the four older children are in the same foster home,

"seem to be doing really well," and "are well bonded with their foster families."  The

youngest child is placed with a relative.  The children have advised the GAL that "if

they're not going back with mom, they want to stay where they are."  She has noticed

that the children are "much more well behaved.  Their behavior and demeanor has

changed since they have been in the foster placement these past few months."  She

believes that placing the children in the agency's permanent custody is in the children's

best interests due to appellant's instability and poor judgment.  The GAL related that

she also has had multiple conversations with the doctor who evaluated appellant and

that this doctor's report factored into her recommendation.

{¶39} The court also admitted the GAL's report. The GAL recommended that the court place the children in the agency's permanent custody. She asserted that appellant has had "ample opportunity to show that she is capable of providing a safe environment for the children." She recognized that appellant complied with components of her case plan, but appellant "continued to exercise poor judgment in who she allows around her children, does not have stable employment or housing, and fails to get the children to school." The GAL also stated that she "has major concerns for the alleged physical abuse" that A.S. disclosed during her forensic interview and for the bruising found on K.B. in January 2023. The GAL did not believe that R.B. could or should be placed with either parent "given the circumstances surrounding his siblings."

{¶40} R.B.'s paternal grandfather testified that the child has been in his home since January 13, 2023. The grandfather stated that the child is bonded to the family and that he intends to adopt the child if the court grants the agency permanent custody of the child.

{¶41} On June 26, 2023, the magistrate entered a decision that granted the agency permanent custody of the children. On that same date, the trial court adopted the magistrate's decision. The trial court found that the four oldest children have been in the agency's temporary custody for more than 12 out of the past 22 consecutive months. With respect to R.B., who had not been in the agency's custody for at least 12 months, the court found that appellant "has failed to remedy the problems that initially caused the children to be placed outside the home, and has failed continuously and repeatedly to substantially remedy the conditions causing her children to be placed outside their home." The court found that even though R.B. had been in the agency's

custody for only a few months, "given [appellant's] mental health diagnoses, as well as her actions regarding the child's siblings, and the lack of participation of the Father, * * * the child cannot be placed with a parent within a reasonable period of time." The court found by clear and convincing evidence that R.B. "could not and should not be placed with either parent within a reasonable time."

{¶42} The court noted that appellant has been diagnosed with unspecified personality disorder with mixed borderline and dependent traits, unspecified bipolar and related disorder, posttraumatic stress disorder, and panic disorder. The court recited findings from appellant's psychological evaluation, which included a statement that appellant's "prognosis based on historical factors is guarded, at best."

{¶43} The court found that the children "are in stable placements and are thriving." The court stated that it did not have a duty "to experiment with [the children's] welfare on the speculative assertion that a parent would not regress into old behaviors."

{¶44} The court noted that it had concerns regarding the agency's compliance with court orders but found that those concerns did not "offset the finding that the children need structure and stability which cannot be provided by any parent herein."

{¶45} The court thus determined that placing the children in the agency's permanent custody is in their best interests.

{¶46} On July 10, 2023, appellant filed objections to the magistrate's decision. She objected to the magistrate's finding that one of the R.C. 2151.414(B)(1) factors apply to R.B. Appellant challenged the magistrate's finding that appellant "has failed to remedy the problems that initially caused the children to be placed outside the home,

and has failed continuously and repeatedly to substantially remedy the conditions causing her children to be placed outside their home."

{¶47} Appellant further objected to the magistrate's best-interest finding.  She asserted that she and the children are bonded.  Appellant stated that she attended the majority of her visits with the children and interacted appropriately with them during those visits.  She also pointed to the testimony that the children stated that they would like to return to her custody.  Appellant additionally argued that she complied with her case plan and that she, therefore, can provide the children with a legally secure permanent placement.

{¶48} On August 31, 2023, the trial court overruled appellant's objections to the magistrate's decision.  The court rejected appellant's assertion that the agency failed to present clear and convincing evidence that one of the R.C. 2151.414(B)(1) factors apply to R.B. and that placing the children in the agency's permanent custody is in their best interest.  The court found that the evidence shows that "the children cannot be placed with either parent within a reasonable amount of time or should not be placed with any parent."  The court determined that the record established the following:  (1) the children had been removed from the home numerous times; (2) appellant has not been able to provide a consistent, safe, and stable home environment for the children; (3) appellant failed continuously and repeatedly to substantially remedy the conditions causing the children's removal; and (4) no other parent is available or capable of parenting the children.  The court further found that the children "are in stable, safe and secure placements and are thriving."  The court thus overruled appellant's objections and

confirmed its earlier finding that granting the agency permanent custody of the children is in their best interests. This appeal followed.

ASSIGNMENT OF ERROR

THE AWARD OF PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶49} In her sole assignment of error, appellant argues that the trial court's decision to award the agency permanent custody of the children is against the manifest weight of the evidence. She first asserts that the evidence fails to show that the youngest child, R.B., who had not been in the agency's temporary custody for 12 or more months of a consecutive 22-month period, could not be placed with her within a reasonable time or should not be placed with her. Appellant claims that she complied with her case plan and that the agency did not present any evidence that she failed to remedy the conditions that caused the child's removal. She further faults the agency for not attempting to verify that appellant had obtained housing in Indiana or that she had stable employment.

{¶50} Next, appellant contends that the weight of the evidence does not support a finding that granting the agency permanent custody of the children is in their best interests. She asserts that she consistently visited the children and interacted appropriately with the children. Appellant also states that the children are bonded with her and wish to return to her care. She additionally alleges that she can provide the children with a legally secure permanent placement. Appellant again asserts that she complied with the case plan, which shows that the children have a legally secure permanent placement.

{¶51} Appellant also charges that the agency has not provided necessary services for the children. She states that the agency failed to ensure that D.B. received appropriate care to help treat his autism. She also notes that the child needs to wear eyeglasses and that he has not been wearing these glasses. Appellant further points out that A.B. sustained a hairline fracture to her arm while in the agency's temporary custody and that A.S. missed some appointments that she needed to attend in order to receive social security benefits. Appellant asserts that "[i]t is hard to see how granting permanent custody of the children is in their best interest when the Agency is not even able to provide them basic necessary services."

{¶52} The agency contends that clear and convincing evidence supports the trial court's finding that R.B. could not be placed with appellant within a reasonable time or should not be placed with her. The agency notes that the trial court specifically found that appellant's "mental health diagnoses, as well as her actions regarding the child's siblings, and the lack of participation of the Father" show that the child cannot be placed with either parent within a reasonable time. The agency further points out that the trial court agreed with Dr. Griffiths, who stated in his report that "the most potent predictor of future behavior is ultimately past behavior."

{¶53} The agency additionally asserts that clear and convincing evidence supports the trial court's finding that permanent custody is in the children's best interests. The agency states that appellant had "multiple episodes with Agency involvement," and she "was incapable of providing a consistent, safe and stable environment for the children." The agency additionally notes that the court recognized that appellant "is very skilled in saying what needs to be said, filing protection orders,

and doing what's necessary to check off the boxes on what she's supposed to do."

However, the court remained concerned that appellant is not capable "of actually

implementing what she's learned." The agency also points out that the trial court

expressed concern regarding appellant's parental judgment and found that her "lack of

discretion in judgment is a present risk of harm to the safety of the children."

STANDARD OF REVIEW

{¶54} Generally, a reviewing court will not disturb a trial court's permanent-

custody decision unless the decision is against the manifest weight of the evidence.

*E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 27; *In re R.S.*, 4th

Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶ 29. When an appellate court reviews

whether a trial court's permanent custody decision is against the manifest weight of the

evidence, the court " ' "weighs the evidence and all reasonable inferences, considers

the credibility of witnesses and determines whether in resolving conflicts in the

evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage

of justice that the [judgment] must be reversed and a new trial ordered." ' " *Eastley v.*

*Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting

*Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001),

quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting

*State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). We further

observe, however, that issues relating to the credibility of witnesses and the weight to

be given the evidence are primarily for the trier of fact. As the court explained in

*Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984): "The

underlying rationale of giving deference to the findings of the trial court rests with the

knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian*, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, ¶ 7.

{¶55} The question that an appellate court must resolve when reviewing a permanent-custody decision under the manifest-weight-of-the-evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986).

{¶56} In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and

determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.").

{¶57} Thus, if a children-services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 62 (4th Dist.); *In re R.L.*, 2d Dist. Greene Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' "). A reviewing court should find a trial court's permanent-custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

PERMANENT-CUSTODY PROCEDURE

{¶58} Before a court may award a children-services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. R.C. 2151.414(A)(1). Additionally, when considering whether to grant a children-services agency permanent custody, a trial

court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' " *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 29, quoting R.C. 2151.01(A).

R.C. 2151.414(B)(1)

{¶59} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children-services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and, as relevant here, one of the following circumstances applies:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> * * * *
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶60} In the case before us, appellant agrees that the four older children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. Therefore, we do not address this factor. Appellant contends, however,

that the evidence fails to support a finding under R.C. 2151.414(B)(1)(a) that the

youngest child, R.B., cannot be placed with her within a reasonable time or should not

be placed with her.

{¶61} R.C. 2151.414(E) requires a court that is determining whether a child

cannot be placed with either parent within a reasonable period of time or should not be

placed with the parents to consider all relevant evidence.  The statute further specifies

that if one or more of the specified conditions exist "as to each of the child's parents, the

court shall enter a finding that the child cannot be placed with either parent within a

reasonable time or should not be placed with either parent."  As relevant here, some of

those conditions are as follows:

> (1) Following the placement of the child outside the child's home and
> notwithstanding reasonable case planning and diligent efforts by the agency
> to assist the parents to remedy the problems that initially caused the child
> to be placed outside the home, the parent has failed continuously and
> repeatedly to substantially remedy the conditions causing the child to be
> placed outside the child's home.  In determining whether the parents have
> substantially remedied those conditions, the court shall consider parental
> utilization of medical, psychiatric, psychological, and other social and
> rehabilitative services and material resources that were made available to
> the parents for the purpose of changing parental conduct to allow them to
> resume and maintain parental duties.
> * * * *
> (4) The parent has demonstrated a lack of commitment toward the
> child by * * * showing an unwillingness to provide an adequate permanent
> home for the child;
> * * * *
> (16) Any other factor the court considers relevant.

{¶62} A trial court may base its decision that a child cannot or should not be

placed with either parent within a reasonable time upon the existence of any one of the

R.C. 2151.414(E) factors.  The existence of one factor alone will support a finding that

the child cannot be placed with either parent within a reasonable time or should not be

placed with either parent. *See C.F.* at ¶ 50; *In re William S.*, 75 Ohio St.3d 95, 661

N.E.2d 738 (1996); *e.g., In re L.R.B.*, 2d Dist. Montgomery No. 28826, 2020-Ohio-6642,

¶ 52; *In re Hurlow*, 4th Dist. Gallia No. 98CA6, 1998 WL 655414 (Sept. 21, 1998).

{¶63} In the case at bar, the problems that led to R.B.'s removal related to

appellant's inability to consistently maintain a stable environment for her children in

which they would be free from abuse at the hands of appellant's companions. As the

trial court found, at least two of her companions had abused her children. And two of

her children have been diagnosed with anxiety and posttraumatic stress disorder as a

result of events that occurred in appellant's home. Although appellant filed protection

orders after her children already had been harmed, she repeatedly engaged in this type

of behavior—allowing men into her life who harmed her children and seeking protection

orders against them after they already had caused harm. Appellant's psychological

evaluation indicated that her mental-health issues led to these poor decisions and

placed herself and her children at risk. Given appellant's history and mental-health

diagnoses, the trial court reasonably could have determined that appellant would

engage in similar behavior in the future and, thus, once again place her children in

danger of being abused by her companions.

{¶64} To the extent that R.C. 2151.414(E)(1) is not a proper basis to support the

trial court's finding that R.B. cannot be placed with appellant within a reasonable time or

should not be placed with appellant, the same evidence referenced above supports

findings under R.C. 2151.414(E)(4) and (16). *See In re B.S.*, 4th Dist. Pike No.

18CA890, 2018-Ohio-4645, ¶ 61 ("R.C. 2151.414(E)(1) thus requires the agency to

provide both a case plan and time to remedy the cause of the children's removal from

the home"); *id.* at ¶ 67, quoting *Gulbrandsen v. Summit Acres, Inc.*, 2016-Ohio-1550, 63 N.E.3d 566, ¶ 41 (4th Dist.) (stating that appellate courts " 'must nevertheless affirm the [trial court's] judgment if it is legally correct on other grounds' ").  Appellant's repeated behaviors in allowing unsavory men into her home shows that she has "demonstrated a lack of commitment toward the child by * * * showing an unwillingness to provide an adequate permanent home for the child."  R.C. 2151.414(E)(4).

{¶65} We further observe that evidence that a parent chooses to engage with an individual who abused the parent's child may support a finding that the parent lacks protective capacities or a commitment to providing for a child's emotional needs.  *In re A.M.*, 2018-Ohio-646, 105 N.E.3d 389, ¶ 82 (4th Dist.) (concluding that mother's denials of sexual abuse and continued relationship with abuser showed that mother lacked "protective capacities, commitment to providing for child's emotional needs, and may support findings under" R.C. 2151.414(E)(4) or (14)), citing multiple cases, including *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 47 (concluding that mother's decision to remain living with pedophile-husband supported finding under R.C. 2151.414(E)(14) that she is unwilling to prevent children from suffering physical, emotional, or sexual abuse); *In re A.J.*, 6th Dist. Lucas No. L-13-1118, 2014-Ohio-421, ¶ 55 (stating that mother's "continued skepticism about what occurred under her own roof displays a conscious disregard to protect her children and for their well-being"); *In re J.H.*, 12th Dist. Preble No. CA2007-07-016, 2007-Ohio-7079, ¶ 30-31 (determining that evidence did not show that father prioritized his children's safety and thus would be unwilling to protect children from future abuse when he intended to stay married to his wife, the abuser, and when he failed to acknowledge that his wife abused the children);

*In re Moore*, 7th Dist. Belmont No. 04-BE-9, 2005-Ohio-136, ¶ 40 (upholding trial court's permanent custody decision based, in part, upon testimony from sexual-abuse investigator that "if a parent does not believe abuse allegation by a child, they would not be capable of protecting that child from future abuse"); *Matter of Ranker*, 11th Dist. Portage Nos. 95-P-0093-0096, 1996 WL 761159, *10 (Dec. 6, 1996) (noting that court may grant permanent custody when mother is unable to protect her children from a foreseeable abusive situation). In the case before us, appellant repeatedly allowed individuals into her home who harmed her children. This behavior supports a finding that appellant lacks adequate protective capacities or a commitment to providing for her children's safety.

{¶66} Moreover, the trial court could have determined that the totality of the circumstances are other relevant factors under R.C. 2151.414(E)(16) that establish that R.B. cannot be placed with appellant within a reasonable time or should not be placed with appellant. *See B.S.* at ¶ 72 (citing multiple factors regarding parent's lack of protective capacity and observing that "the trial court could have quite reasonably found that under R.C. 2151.414(E)(16), the children cannot be placed with the mother within a reasonable time or should not be placed with the mother").[3]

{¶67} Consequently, we disagree with appellant that the evidence fails to support the trial court's finding that R.C. cannot be placed with her within a reasonable time or should not be placed with her.

---

[3] R.B.'s father did not appear at the permanent custody hearing. His counsel stated that he has not had any contact with R.B.'s father and does not "know where he is at or what he's doing."

BEST INTEREST

**{¶68}** Next, appellant contends that the record does not contain clear and convincing evidence to support the trial court's best-interest determination.

**{¶69}** R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children-services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's GAL, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

**{¶70}** Deciding whether a grant of permanent custody to a children-services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.  However, none of the best-interest factors requires a court to give it "greater weight or heightened significance."  *Id.* Instead, the trial court considers the totality of the circumstances when making its best-interest determination.  *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent

situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 66, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

**{¶71}** In the case at bar, we believe that the record contains ample, clear and convincing evidence to support the trial court's decision that placing the children in the agency's permanent custody is in their best interests. The record does not support a finding that the trial court committed a manifest miscarriage of justice. Therefore, the trial court's judgment is not against the manifest weight of the evidence.

### 1. Children's Interactions and Interrelationships

**{¶72}** The evidence shows that appellant interacted appropriately with the children during her visits and that the children are bonded with appellant. However, when the children were in her custody, she did not ensure that they would be safe from abuse due to appellant's poor choice in men. Two of appellant's children suffer from anxiety and PTSD as a result of events that occurred in appellant's home. While we do not doubt appellant's love for her children, her actions, or lack thereof, have caused her children harm.

**{¶73}** Both the GAL and the caseworker testified that the children are doing well in their current placements and that they have improved since being removed from appellant's custody.

### 2. Children's Wishes

**{¶74}** The older children stated that they would like to return to appellant's custody but that they are happy remaining in the foster home if they cannot return home.

{¶75} The GAL recommended that the court grant the agency permanent custody of the children. *C.F.* at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 32 (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as child directly expresses or through the GAL).

### 3.  Custodial History

{¶76}  The children have not had a stable custodial history.  In 2017, the two oldest children, A.B. and A.S., were removed from appellant's custody.  The court returned the children to appellant's custody about six months later.  They remained in appellant's custody subject to the agency's protective supervision until 2018.

{¶77} The next year, the agency filed dependency complaints involving A.B., A.S., and D.B.  The agency maintained protective supervision over the children until February 2020.

{¶78}  In March 2021, the court placed A.B., A.S., D.B., and K.B. in the agency's temporary custody.  In May 2022, the court adjudicated R.B. a dependent child and placed him in the agency's protective supervision.  The four oldest children remained in the agency's temporary custody until August 24, 2022.

{¶79}  About five months later, in January 2023, the court placed all five children in the agency's temporary custody.

{¶80}  When the agency filed its permanent custody motion regarding R.B., the youngest child, he had been in the agency's temporary custody for one month.[4]  The

---

[4] We recognize that R.C. 2151.414(B)(1) states that a child is "considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the

four oldest children had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.

### 4. Legally Secure Permanent Placement

**{¶81}** "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re M.B.* at ¶ 56.

---

Revised Code or the date that is sixty days after the removal of the child from home." Even if this provision means that R.B.'s time subject to the agency's protective supervision counts when calculating the 12-month period, R.B. had only been in the agency's "temporary custody" for about eight and one-half months (i.e., on May 27, 20222, he was adjudicated dependent, and this date is earlier than the date that is 60 days after removal). *But see In re Ar.S.*, 3d Dist. Marion No. 9-19-09, 2019-Ohio-5378, ¶ 26 (stating that a period of protective supervision following an adjudication does not count for purposes of calculating the 12-month period).

{¶82} In the case before us, clear and convincing evidence supports the trial court's finding that the children need a legally secure permanent placement and that they can only achieve this type of placement by granting the agency permanent custody. Appellant failed to demonstrate that she possesses the protective capacities needed to prevent others from harming her children. She engaged in a repeated pattern of behavior by allowing men into her life and into her home who, tragically, abused her children. Two of the children suffered so much that they have been diagnosed with anxiety and posttraumatic stress disorder. A home without a parent capable of providing children with a safe environment in which all of their needs will be met is not a legally secure permanent placement. Thus, even if, on the surface, appellant complied with all of the tasks listed in her case plan, she has not been able to consistently demonstrate the ability to protect her children from harm at the hands of others. The four oldest children have bounced between appellant's custody and foster care throughout the agency's involvement with the family, and all five children desperately need "stability and security * * * to become productive and well-adjusted members of the adult community." *Ridenour*, 61 Ohio St.3d at 324.

{¶83} Based upon all of the foregoing reasons, the trial court could have firmly believed that placing the children in the agency's permanent custody is in their best interests. Therefore, we do not believe that the trial court's best-interest determination is against the manifest weight of the evidence.

{¶84} Furthermore, as this court often notes:

"* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is

the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * *  The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."

*In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987).  In the case at bar, two of appellant's children already have suffered great harm due to appellant's home environment.  Thus, the trial court quite reasonably could have determined not to experiment with the children's welfare by placing them in appellant's custody when she repeatedly displayed a pattern of behavior of allowing harmful individuals into her home.

**{¶85}** Moreover, even if appellant complied with every task listed in her case plan, as we have observed in the past, a parent's case-plan compliance may be a relevant, but not necessarily conclusive, factor when a court considers a permanent custody motion.  *In re B.P.*, 4th Dist. Athens No. 20CA13, 2021-Ohio-3148, ¶ 57; *In re T.J.*, 4th Dist. Highland No. 2016-Ohio-163, ¶ 36, citing *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 ("although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"); *In re S.C.*, 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification"); *accord In re K.M.*, 4th Dist. Ross No. 19CA3677, 2019-Ohio-4252, ¶ 70, citing *In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency"); *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 ("substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous").

"Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.' " *W.C.J.* at ¶ 46, quoting *In re Gomer*, 3d Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, ¶ 36; *accord In re K.J.*, 4th Dist. Athens No. 08CA14, 2008-Ohio-5227, ¶ 24 ("when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan").  Thus, a parent's case-plan compliance will not preclude a trial court from awarding permanent custody to a children services agency when doing so is in the child's best interest.  *W.C.J.* at ¶ 46.

{¶86} As we stated above, granting the agency permanent custody of the children is in their best interest.  Appellant's case-plan compliance does not override the children's best interests or establish that the trial court's decision is against the manifest weight of the evidence.

{¶87} Moreover, we do not agree with appellant that any agency failure to ensure that D.B. receives appropriate treatment for his autism or any other failures demonstrate that placing the children in the agency's permanent custody is not in their best interests. The evidence shows that the agency has continued to attempt to find an appropriate provider for D.B.  Additionally, any missed appointments stemmed from the need to manage the appointment schedules of the four older children's needs.  Plus, the evidence shows that the children have improved since being removed from appellant's home and that they are happy with their foster families.  Thus, any agency failures have not negatively impacted the children's health, safety, or well-being.

**{¶88}** Accordingly, based upon the foregoing reasons, we overrule appellant's

sole assignment of error.

CONCLUSION

**{¶89}** Having overruled appellant's sole assignments of error, we affirm the trial

court's judgment.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge




**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**