[Cite as *In re B.S.*, 2024-Ohio-5183.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

IN THE MATTER OF: :

                               :

                               B.S.
                               and
                               E.S.
                               ,

                               CASE
                               NO.
                               24CA
                               4069

                             :

         Adjudicated Dependent    :
           DECISION AND JUDGMENT
         ENTRY
       Children.

                               :

---

APPEARANCES:

Alana Van Gundy, Bellbrook, Ohio, for appellant.[1]

Shane A. Tieman, Scioto County Prosecuting Attorney, and Elisabeth M. Howard, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

---

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:10-23-24
ABELE, J.

---

[1] Different counsel represented appellant during the trial court proceedings.

**{¶1}** This is an appeal from a Scioto County Common Pleas Court, Juvenile Division, judgment that granted Scioto County Children Services, appellee herein, permanent custody of eleven-year-old B.S. and nine-year-old E.S.

**{¶2}** Appellant Kayla Riley, the children's biological mother, raises the following assignments of error:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE JUVENILE COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILD[REN], WHEN THAT FINDING WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "RULE 48 WAS VIOLATED WHEN THE CASA/GAL DID NOT CONTACT THE MOTHER OR PROVIDE HER CONTACT INFORMATION, DID NOT OBSERVE MOTHER WITH THE CHILDREN, DID NOT VISIT MOTHER'S HOME AND DID NOT VIEW THE CHILD AT HIS PLACEMENT PRIOR TO RECOMMENDING PLACEMENT."

**{¶3}** On January 12, 2021, appellee filed a complaint that alleged B.S. and E.S. are "neglected/dependent children," and asked the court to place the children in its temporary custody. An affidavit attached to the complaint asserted that on January 10, 2021, appellee received a report that appellant "tested positive for multiple unprescribed drugs (suboxone, oxycodone, TCH [sic])." A caseworker responded to the address that appellant had provided, "but it turned out to be a false address." When the caseworker called appellant, appellant

refused to provide an address. Appellee nevertheless managed to find an address, and a caseworker visited this location.

{¶4} Upon arrival, appellant and her boyfriend, Josh, told the caseworker to leave, and they "then fled with the two boys." The next day, a caseworker located the boys at their paternal grandmother's residence. The paternal grandmother advised the caseworker that appellant told her that appellee "and law enforcement" were "trying to take the boys."

{¶5} Subsequently, law enforcement officers arrested appellant and requested an ex parte temporary custody order, which the trial court granted.

{¶6} On March 18, 2021, the trial court adjudicated the children dependent. The court's dispositional order placed the children in appellee's temporary custody.

{¶7} The trial court held several review hearings throughout the case. One hearing had been scheduled for January 5, 2023. On January 13, 2023, the court entered an order to continue the January 5, 2023 review hearing until April 18, 2023, due to "its congested docket." Nonetheless, in this entry the court adopted a January 4, 2023 case plan that indicated that both children had "completed a pre-placement visit [with appellant] over the Christmas holidays" and the children would

be returned to appellant's custody while she resided in her stepfather's home. The case plan further stated that appellant "will seek independent, stable housing for her and the boys."

{¶8} On January 30, 2023, the attorney for the children's guardian ad litem filed a motion to request a status conference be held before April 18, 2023. The court granted this motion and set the matter for a February 9, 2023 status conference. The record, however, does not indicate whether this status conference occurred. Instead, the next filing is appellee's April 17, 2023 motion to modify the disposition to permanent custody. Appellee asserted that the children have been in its temporary custody for 12 or more months of a 22-month period and that placing the children in its permanent custody is in their best interests.

{¶9} On September 14, 2023 and January 3, 2024, the trial court held a hearing to consider appellee's permanent custody motion. At the hearing, caseworker Veronica Neeley testified that in January 2021, a caseworker tried to find appellant and the children and found her at her boyfriend's house. Appellant's boyfriend, Josh, told the caseworker to leave the house, and he and appellant "reportedly ran out the back door and left with the children." Appellee later received a phone

call that the children were with a grandmother. Caseworkers then responded to the grandmother's home, interviewed the children, and took emergency temporary custody. At the time of removal, appellant tested positive for suboxone, oxycodone, and THC.

{¶10} Appellant last visited B.S. during "the Christmas holidays" in 2022. At that time, appellant had made "remarkable improvements" and "was not with Josh." Caseworker Neeley "was strongly advocating for [appellant] to try to get her boys back." During this time frame, appellant recognized that Josh had a negative influence on her and being away from him was "good" for her. Additionally, appellee consistently advised appellant that "Josh is a problem." Neeley told appellant that being around Josh "is a problem for your kids," "is unhealthy" for appellant, and is "unhealthy" for her children. Appellant acknowledged "that Josh was a problem for her."

{¶11} Between December 2022 and January 2023, Caseworker Neeley and appellant exchanged text messages to schedule visits. On January 18, 2023, however, appellant sent Neeley a text message that stated appellant was "at the point where she was done with it," meaning the "monthly visits, scheduling, things such as that." Also in January 2023, appellant resumed living

with Josh.  Once appellant moved in with Josh, B.S. "became very adamant" that he did not "want to be around" Josh.  Neeley told appellant about the allegations that the children made regarding Josh and informed appellant that appellee could not "place these kids around someone where all these allegations are there, whether they're founded or unfounded."[2]

{¶12} Moreover, at times, appellant did not consistently visit the children.  The children reacted to appellant's failure to consistently visit "in a negative way."  Appellant currently does not have any visits with the children because B.S. stated "that he does not want to have any involvement with [appellant] while she is with Josh[]."

{¶13} B.S. has been in his current foster home for about one month.  It is a foster-to-adopt home, and B.S. "absolutely loves being there" and is "adjusting very well."  Two older children also live in the home, and B.S. "absolutely adores" them.  B.S. does not have any interest in being placed with E.S. and remains adamant that he does not want to live with appellant.

{¶14} E.S. has been in residential treatment since May 25,

---

[2] The record does not reveal the precise nature of the allegations, but some reference is made to possible sexual abuse.

2022.  Before that date, E.S. started "having a lot of behaviors" such as "stealing everything and then selling it at school."  He was "fighting in the home" and "fighting at school."  E.S.'s behaviors have improved while in residential treatment and, as of September 14, 2023, appellee was seeking a foster placement for him.  Appellant last visited E.S. in April or May 2023, while he was in a hospital for reasons not disclosed.

{¶15} When the children entered appellee's temporary custody, appellee had concerns about appellant's substance abuse and lack of independent housing.  As of September 14, 2023, appellee has not received any confirmation that appellant successfully has completed a drug treatment program, and appellant does not have independent housing.  Instead, appellant continues to live with Josh.

{¶16} Caseworker Neeley's last contact with appellant occurred about two weeks before the September 14, 2023 hearing.  At that time, appellant asked Neeley if appellee would add Josh to the case plan.  Neeley informed appellant that adding Josh was not possible because appellee had filed a request for permanent custody.  Plus, "there were a lot of allegations that involved" Josh, and appellee had informed appellant that Josh

was "a problem."

{¶17} The children's GAL testified that between January and March 2022, she attended five or six of the visits the children had at the agency. Appellant was present for only one visit. During the other visits, the children's caseworker talked with the children and helped them "process their feelings and what are they . . . thinking." The GAL stated that "there was a lot of talk between the boys about being afraid of Josh."

{¶18} Appellee's counsel asked the GAL whether she "had any one-on-one conversations with" appellant and whether appellant "understood what she needed to do to get her kids back." The GAL started to explain, "Well, I don't know if our conversations went–[.]" Before the GAL could finish, appellant interjected, "Our conversation went really bad" because the GAL "laughed in [appellant's] face." At that point, the court took a break and eventually recessed until January 3, 2024.

{¶19} At the January 3, 2024 hearing, the GAL resumed her testimony and recommended that the court place the children in appellee's permanent custody. She explained that E.S. had told her in previous conversations that he does not want to live with Josh, but "he would be okay going back to" appellant. The GAL reported that B.S. does not want to live with Josh. The GAL

Scioto, 24CA4069

also indicated that, since the last hearing, E.S. has been placed in a new home in Columbus. Although she has not yet visited E.S.'s new placement, she visited B.S. in his foster home. The GAL explained that she did not visit Josh's home, where appellant resided, for a couple of reasons: (1) Josh's home was not considered "independent housing"; and (2) appellant's demeanor was "very abrasive."

{¶20} During the GAL's testimony and on cross-examination, appellant interjected some comments that required the trial court to (1) admonish appellant that she needed to "watch [her] language," and (2) advise appellant that the court could continue with appellant "in the hallway." The court then asked the GAL some clarifying questions and took a break. After the return from the break, the court cautioned appellant to show proper decorum and respect in the courtroom. She responded, "I just want this to be over with. Can we just go on with it, please?"

{¶21} Appellant then testified that she sought treatment for her drug abuse problem through a facility named Amazing Grace. She has been taking methadone for nearly three years. For the past five years, she primarily lived with Josh and his ten-year-

old son, although she did separate from Josh on two occasions and stayed with her parents. B.S. and E.S. lived with her and Josh at various points, but after appellee informed appellant that Josh could not be around the children, appellant left Josh, but appellee still did not allow her to see the children.

**{¶22}** Appellant stated that she has not recently attempted to visit the children. E.S. lives in Columbus and she does not have transportation. She had heard that B.S. does not want to visit her or talk with her, and she also heard the testimony during the previous hearing in which B.S. reported that he did not want to return to live with her. Appellant stated that Josh never did anything to hurt B.S. She agreed that she and Josh had "a couple of fights," but stated that the children "were never harmed." Appellant believes that, with Josh's help, she would have the financial means to care for the children.

**{¶23}** Appellant further stated that she has had a difficult relationship with the children's GAL. She explained that "the very first visit," the GAL "laughed in [appellant's] face" and told her that she was never "going to get [her children] back." Appellant further claimed that she tried to contact appellee to discuss visit with the children, but she received no response from the caseworkers.

**{¶24}** During cross-examination, appellant explained that, before the children were removed, B.S. primarily lived with his paternal grandmother and great-grandmother. She indicated that she lived with the paternal father's family when B.S. was born, and the family "helped [her] take care of the kids on a regular basis." She remained in this home until July 2017, when she and the children's father ended their relationship. At the time, appellant and the children's father had been taking fetanyl. When she left the children's father, she entered a drug rehabilitation program. The children remained with the paternal father's family, and appellant gave the paternal grandmother and great-grandmother guardianship of the children.

**{¶25}** The paternal grandmother and great-grandmother began to develop health issues, and beginning in October 2020, appellant had both children in her care on a full-time basis. Shortly thereafter, appellee removed the children from her care.

**{¶26}** Appellant agreed that in December 2022, she had B.S. for approximately two weeks and E.S. for five days. She explained that in early January 2023, the trial court held a hearing,[3] and appellee stated that appellant could have "a trial period." Appellant further stated that one caseworker indicated

---

[3] The record does not contain a transcript of this hearing.

"that the boys had said something when they went to [appellant's parent's house] but nobody would tell [her] what." Appellant suggested this lack of communication frustrated her and prompted her return to Josh.

{¶27} On March 29, 2024, the trial court granted appellee's request for permanent custody of the children. The court found that the children have been in appellee's temporary custody for 12 or more months of a consecutive 22-month period and that placing them in appellee's permanent custody is in their best interests.

{¶28} The court considered the children's interactions and interrelationship and found that the children do not have any relationship with their father, and their relationship with appellant is "strained." The children lived with appellant "for the first few years of their lives," while also living with the paternal grandmother and great-grandmother. During that time, appellant "was in drug addiction." Appellant later left the home to avoid her drug addiction negatively impacting the children. The children remained with the paternal grandmother and paternal great-grandmother.

{¶29} Subsequently, the paternal grandmother and great-grandmother became unable to care for the children, so appellant

Scioto, 24CA4069

began to care for the children. Two months later, appellee removed the children from appellant's care. Appellant subsequently entered a drug treatment program and continues to use methadone.

**{¶30}** Appellant did not begin mental health treatment until August 2023. Appellant "has four severe mental health diagnoses," and stated that she "nearly beat someone to death"[4] while the case was pending.

**{¶31}** Regarding the children's wishes, the trial court stated that it did not interview the children "but was advised of the children's wishes through the [GAL] report and gave the children's wishes due consideration." The court noted that B.S. does not want to see appellant, and "E.S. has stated at times that he does not want to see [appellant]." The court found that the children "do not want to live with [appellant] and her boyfriend."

**{¶32}** The trial court additionally determined that the children need a legally secure permanent placement and they cannot achieve this type of placement without placement in

---

[4] We observe that appellant testified that she had been "on a medication for bipolar and it made [her] extremely violent." She explained that as a result, she "almost caught felonious assault charges" because she "beat somebody up so bad."

appellee's permanent custody.  The court noted that appellant struggled with drug addiction and has not been able to provide the children with a stable life.  The court stated that appellant's inability to conquer her drug addiction continues to be a "barrier[] to providing the children with a safe, stable, and secure home environment."  The court additionally found that "[t]here was domestic violence."

{¶33} The trial court further determined that appellant did not complete the case plan and stated that "[h]er behavior remains uncontrolled and very erratic."  The court observed that appellant "told the case worker that 'she was done,'" and she "told the [c]ourt that she 'just wanted the hearing to be over.' She stated, 'look what time it is.'"  The court observed that when appellant made that comment, it "was 3:30 in the afternoon," and "[a]pparently, she had somewhere else to be."

{¶34} Consequently, the trial court determined that placing the children in appellee's permanent custody would be in their best interests and granted appellee's permanent custody motion. This appeal followed.

I

{¶35} In her first assignment of error, appellant asserts that the record does not contain sufficient evidence to support

the trial court's judgment and that its judgment is against the manifest weight of the evidence. Specifically, she contends that appellee did not present clear and convincing evidence that placing the children in appellee's permanent custody is in their best interests. Appellant alleges that she "substantially completed her case plan," and claims that she "had housing, employment, was in mental health and drug treatment and testified repeatedly that she was not receiving calls back from the agency and there were issues with visitation."

**{¶36}** Appellant further argues that R.C. 2151.414(B) required appellee to present clear and convincing evidence that the children cannot be placed with either parent within a reasonable period of time. Appellant complains that appellee failed to "produce evidence that [she] could not parent her [c]hildren." Appellant states that (1) one of the children "expressed interest in remaining with her," (2) she "had voluntarily been in treatment and was addressing personal issues," and (3) she "broke up with her boyfriend and ended up homeless," but appellee "did not change [its] stance."

**{¶37}** Appellant further asserts that she informed appellee "that she had completed her case plan," but appellee did not inform her of the "additional things that she needed to do" to

have the children returned to her care. Appellant alleges that she "had stable housing and stable income while" she lived with Josh. She contends that appellee did not take adequate steps to resolve any concerns that it had regarding Josh so that the children could be placed in the home with appellant and Josh. Appellant contends that, rather than requiring her to live separate from Josh, appellee should have included him on the case plan and developed an action plan to resolve the concerns.

A

**{¶38}** We initially note that appellant asserts that the abuse-of-discretion standard of review applies when evaluating whether clear and convincing evidence supports a trial court's permanent custody judgment. This court, however, does not apply an abuse-of-discretion standard to review permanent custody judgments. *E.g.*, *In re B.E.*, 2014-Ohio-3178, ¶ 27 (4th Dist.). Moreover, the Ohio Supreme Court recently held that the abuse-of-discretion standard of review does not apply to an appellate court's review of a trial court's permanent custody judgment. *In re Z.C.*, 2023-Ohio-4703. Instead, according to *Z.C.*,

> the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence

> standards, as appropriate depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶ 18.

**{¶39}** We further note that the Ohio Supreme Court indicated that appellate review of a sufficiency-of-the-evidence challenge is de novo. *Id.* at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("'Whether the evidence is legally sufficient to sustain a verdict is a question of law.'"); *accord State v. Bertram*, 2023-Ohio-1456, ¶ 8 ("A challenge to the sufficiency of the evidence is reviewed de novo."). The *Z.C.* court additionally stated that appellate review of a trial court's decision under the manifest-weight-of-the-evidence standard is deferential. *Id.* at ¶ 15 ("the phrase 'some competent, credible evidence' can be helpful in describing the reviewing court's deferential role in the manifest-weight analysis"). Thus, an appellate court conducts a de novo review when determining whether sufficient evidence supports a trial court's permanent custody judgment. *See* Painter and Pollis, Ohio App. Prac., Appendix G (2023) (sufficiency challenge "trigger[s] de novo review"). When reviewing whether a permanent custody judgment is against the manifest weight of the evidence, appellate courts use a deferential standard of review. *See Black's Law Dictionary* (12th ed. 2024) (the phrase "manifest

Scioto, 24CA4069

weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence"); *see generally id.* (defining "standard of review" as "[t]he criterion by which an appellate court exercising appellate jurisdiction measures the constitutionality of a statute or the propriety of an order, finding, or judgment entered by a lower court").

**{¶40}** Additionally, although appellant's assignment of error refers to sufficiency of the evidence and manifest weight of the evidence, the substance of her argument indicates that she is challenging whether the record contains clear and convincing evidence to support the trial court's judgment, which implicates the manifest-weight standard. In other words, appellant has not argued that appellee failed to meet its burden of production; rather, appellant argues that the state failed to meets its burden of persuasion. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26 ("the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the- evidence standard of review applies to the state's burden of persuasion"); *see also Black's*, quoting Edmund M. Morgan, *The Law of Evidence*, 59 Harv. L. Rev. 481, 491 (1946)

Scioto, 24CA4069

(discussing "burden of persuasion" and stating that "'[p]ractically all courts now recognize the distinction between the burden of producing evidence—that is, the risk of non-production of sufficient evidence to justify a finding—and the burden of persuasion—that is, the risk of failing to persuade the trier to make that finding . . . .'").

{¶41} Therefore, in view of the foregoing, we review appellant's assignment of error using the deferential, manifest-weight standard of review.

B

{¶42} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387,

quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord In re Pittman*, 2002-Ohio-2208, ¶ 23-24 (9th Dist.). We further observe, however, that issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

{¶43} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well (Emphasis sic)." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

{¶44} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence."

Scioto, 24CA4069

*In re K.H.*, 2008-Ohio-4825, ¶ 43. "Clear and convincing

evidence" is:

> the measure or degree of proof that will produce in
> the mind of the trier of fact a firm belief or
> conviction as to the allegations sought to be
> established. It is intermediate, being more than
> a mere preponderance, but not to the extent of such
> certainty as required beyond a reasonable doubt as
> in criminal cases. It does not mean clear and
> unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986). In

determining whether a trial court based its decision upon clear

and convincing evidence, "a reviewing court will examine the

record to determine whether the trier of facts had sufficient

evidence before it to satisfy the requisite degree of proof."

*State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re*

*Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*,

161 Ohio St. 469 (1954) ("Once the clear and convincing standard

has been met to the satisfaction of the [trial] court, the

reviewing court must examine the record and determine if the

trier of fact had sufficient evidence before it to satisfy this

burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-

43 (1986); *compare In re Adoption of Masa*, 23 Ohio St.3d 163,

165 (1986) (whether a fact has been "proven by clear and

convincing evidence in a particular case is a determination for

the [trial] court and will not be disturbed on appeal unless

such determination is against the manifest weight of the evidence").

**{¶45}** Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence.  *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *In re R.L.*, 2012-Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9 (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'").

**{¶46}** Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.  A reviewing court should find a trial court's permanent

custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

C

**{¶47}** We recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'" *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *accord In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

**{¶48}** A parent's rights, however, are not absolute. *In re D.A.*, 2007-Ohio-1105, ¶ 11. Rather, "'it is plain that the

Scioto, 24CA4069

natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

**{¶49}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A).

D

Scioto, 24CA4069

{¶50} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, appellee sought permanent custody by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶51} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
> (e) The child or another child in the custody of

the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶52}** Thus, before a trial court may award a children services agency permanent custody, it must find, by clear and convincing evidence, (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) that awarding the children services agency permanent custody would further the child's best interest.

"Clear and convincing evidence" is:

the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986).

1

**{¶53}** In the case at bar, the trial court found that the children had been in the agency's temporary custody for more than 12 months of a consecutive 22-month period, and thus, R.C. 2151.414(B)(1)(d) applies. Appellant does not challenge this finding. She does, however, assert that R.C. 2151.414(B) required the trial court to find that the children cannot be

placed with either of parent within a reasonable time or should not be placed with the parents.

{¶54} As we have recognized in previous cases,

> under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *In re A.M.1*, 4th Dist. Athens Nos. 10CA21 through 10CA31, 2010-Ohio-5837, ¶ 31; *In re T.F.*, 4th Dist. Pickaway No. 07CA34, 2008-Ohio-1238, ¶ 23. Consequently, when considering a R.C. 2151.414(B)(1)(d) permanent custody motion, the only other consideration becomes the child's best interests. A trial court need not conduct a R.C. 2151.414(B)(1)(a) analysis of whether the child cannot or should not be placed with either parent within a reasonable time. *In re Berkley*, 4th Dist. Pickaway Nos. 04CA12, 04CA13, 04CA14, 2004-Ohio-4797, ¶ 61.

*In re N.S.N.*, 2015-Ohio-2486, ¶ 52 (4th Dist.).

{¶55} In the case sub judice, the trial court concluded that R.C. 2151.414(D)(1)(d) applies. Thus, the statute did not require the court also to determine that the children could not or should not be placed with either parent within a reasonable time.

2

{¶56} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by

Scioto, 24CA4069

granting a children services agency permanent custody.  The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

**{¶57}** Courts that must determine whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best interest] factors," as well as the "five enumerated statutory factors."  *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297, ¶ 19 (10th Dist.). However, none of the best interest factors is entitled to "greater weight or heightened significance."  *C.F.* at ¶ 57. Instead, the trial court considers the totality of the

Scioto, 24CA4069

circumstances when making its best interest determination. *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.). In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

{¶58} In the case before us, appellant does not focus her argument around the best interest factors. For example, she did not argue that the children's interactions and interrelationships with her have been positive or that their interactions and interrelationships while in appellee's temporary custody have been negative. While she does assert that one child expressed some interest in living with her, she does not point out that the other child, B.S., adamantly stated that he does not want to live with appellant so long as she remains with her boyfriend, Josh. Appellant also does not argue why the custodial history tends to show that placing the children in her care is in their best interest. Instead, appellant primarily argues that her conduct warrants returning the children to her care.

{¶59} As we have observed in the past, however, a parent's

Scioto, 24CA4069

efforts to improve the parent's situation, or to comply with a case plan, may be relevant, but not necessarily conclusive, factors when a court evaluates a child's best interest. *In re Ca.S.*, 2021-Ohio-3874, ¶ 39-40 (4th Dist.); *In re B.P.*, 2021-Ohio-3148, ¶ 57 (4th Dist.); *In re T.J.*, 2016-Ohio-163, ¶ 36 (4th Dist.), citing *In re R.L.*, 2014-Ohio-3117, ¶ 34 (9th Dist.) ("although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"); *In re K.M.*, 2019-Ohio-4252, ¶ 70 (4th Dist.), citing *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.) ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification"); *accord In re S.C.*, 2015-Ohio-2280, ¶ 40 (8th Dist.) ("[c]ompliance with a case plan is not, in and of itself, dispositive of the issue of reunification"); *In re C.W.*, 2020-Ohio-6849, ¶ 19 (2nd Dist.) ("[c]ase-plan compliance is not the only consideration in a legal custody determination");. "Indeed, because the trial court's primary focus in a [legal] custody proceeding is the child's best interest," a parent's case plan compliance is not dispositive and does not prevent a trial court from awarding legal custody to a nonparent. *W.C.J.*, 2014-Ohio-5841, at ¶ 46 (4th Dist.). "Thus, a parent's case plan compliance will not preclude a trial

court from awarding legal custody to a nonparent when doing so is in the child's best interest." *In re S.M.*, 2023-Ohio-2686, ¶ 44 (4th Dist.).

{¶60} In the case sub judice, however, even if appellant had complied with every aspect of the case plan, as we explain below, the trial court still could firmly believe that placing the children in appellee's permanent custody is in their best interest.

Children's Interactions and Interrelationships

{¶61} The evidence supports a finding that appellant does not prioritize her relationship with her children over her own desires. In December 2022, appellant left Josh and appellee was close to attempting to reunify the family. At this point, appellant agreed that being with Josh was not healthy. Shortly thereafter, however, appellant returned to live with Josh. Appellant's decision to return with Josh caused appellee concern because (1) appellee repeatedly informed appellant that Josh was a "problem," and (2) the children made some abuse allegations against him or his family members. After nearly two years of appellee's involvement, and on the verge of reunifying with her children, appellant could not, however, separate herself from Josh. Instead, she elevated her relationship with Josh over her

relationship with her children.

{¶62} B.S. is happy and doing well in his current foster home. B.S. stated that he does not want to see or talk with appellant as long as she remains with Josh. B.S. thus plainly does not have a positive relationship with appellant or Josh, and appellant could not or would not recognize the harm that her relationship with Josh has done to her relationship with her child. Rather, she wanted appellee to add Josh to the case plan, despite B.S.'s insistence that he did not want to live with Josh or even talk to appellant so long as she remained with Josh.

{¶63} Between May 2022 and late 2023, E.S. lived in a residential treatment facility to help him learn how to cope with behavioral issues. He made progress, and shortly before the January 2024 hearing, E.S. had been placed in a new home.

{¶64} Consequently, a review of the foregoing evidence shows that (1) appellant does not engage in behavior that creates a healthy or positive relationship with her children, and (2) she has allowed her own desire to live with Josh take precedence over her relationship with her children.

### Children's Wishes

{¶65} As indicated above, B.S. stated that he does not want

to live with appellant. E.S. stated that he did not want to live with Josh, but that he would "be okay" living with appellant. The children's GAL recommended that the court place the children in appellee's permanent custody. *In re C.F.,* 2007-Ohio-1104, ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as the child directly expresses or through the GAL).

## Custodial History

{¶66} With respect to the children's custodial history, the evidence shows that the children have been in appellee's temporary custody since their January 2021 removal. When appellee filed its permanent custody motion, the children had been in its temporary custody for more than two years.

## Legally Secure Permanent Placement

{¶67} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.,* 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re*

Scioto, 24CA4069

*Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (legally secure permanent placement requires more than a stable home and income, but also requires an environment that will provide for child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (mother was unable to provide legally secure permanent placement when she lacked physical and emotional stability and father was unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent"); *Black's Law Dictionary* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in

safety with one or more dependable adults who will provide for the child's needs."  *M.B.*, 2016-Ohio-793, at ¶ 56 (4th Dist.).

**{¶68}** In the case at bar, the evidence shows that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting appellee permanent custody.  As indicated above, appellee informed appellant that living with Josh posed a problem due to the abuse allegations.  Appellant, however, desires to live with Josh. Even if Josh's home is a house with four walls, the unresolved abuse allegations also prevent the home from being considered as a legally secure placement.  The children's GAL testified that she heard the children discussing being afraid of Josh, and B.S. was adamant that he did not want to live with Josh.  Thus, Josh's home is not an environment where the children will feel safe, and it will not satisfy the children's emotional needs or well-being.  Furthermore, with the unresolved abuse allegations, whether the children would be exposed to a risk of harm in Josh's home is unknown.

**{¶69}** Additionally, appellant does not appear to believe that Josh, or one of his relatives, actually harmed her children.  We note that appellee has yet to substantiate any

allegations, and the record does not indicate the investigative efforts, if any, it may have undertaken or the precise nature of the allegations.  This court and others nevertheless have recognized that a parent's refusal to recognize a child's abuse allegations may indicate that the parent is unable to provide the child with an environment in which the child will feel secure and protected from harm.  *See In re D.B.*, 2024-Ohio-377, ¶ 65 (4th Dist.), citing *In re K.H.*, 2008-Ohio-4825, ¶ 47 (mother's decision to remain living with pedophile-husband supported finding that she was unwilling to prevent children from suffering physical, emotional, or sexual abuse); *In re A.J.*, 2014-Ohio-421, ¶ 55 (6th Dist.) (stating that mother's "continued skepticism about what occurred under her own roof displays a conscious disregard to protect her children and for their well-being"); *In re J.H.*, 2007-Ohio-7079, ¶ 30-31 (12th Dist.) (determining that evidence did not show that father prioritized his children's safety and thus would be unwilling to protect children from future abuse when he intended to stay married to his wife, the abuser, and when he failed to acknowledge that his wife abused the children); *In re Moore*, 2005-Ohio-136, ¶ 40 (7th Dist.) (upholding trial court's permanent custody decision based, in part, upon testimony from

sexual-abuse investigator that "if a parent does not believe abuse allegation by a child, they would not be capable of protecting that child from future abuse"); *Matter of Ranker*, 1996 WL 761159, *10 (11th Dist. Dec. 6, 1996) (noting that court may grant permanent custody when mother is unable to protect her children from a foreseeable abusive situation).

{¶70} We certainly sympathize with appellant's stance that attempting to maintain financial independence and a permanent residence as a single mother is very challenging. Nevertheless, in December 2022 appellant apparently had been living in a residence that appellee deemed suitable enough to consider reunifying the children with appellant.[5] In January 2023, however, appellant opted to move in with Josh and sent a text message to her caseworker that she was "done." Thus, appellant decided to abandon her chance to reunify with her children and,

---

[5] We observe that the January 4, 2023 case plan reported that the children "will return to the custody of [appellant] while she is residing in the home of [her stepfather]." The case plan further stated that appellant "has met case plan goals and has a viable plan for [the children]. [Appellant] is currently living with her stepfather, and both boys have a[n] adequate space to reside in the same home. [Appellant] has a plan for independent housing." The next case plan, dated April 18, 2023, indicated that as of March 7, 2023, appellant "has not shown a significant interest in maintaining contact with [the children]," and she "continues to engage in a relationship with a person that both boys have identified as placing them in harmful or unhealthy situations."

instead, chose to move back with Josh, despite her knowledge that appellee would not place the children in a home with Josh.

**{¶71}** In sum, we believe that the foregoing evidence constitutes ample, competent and credible evidence that placing the children in appellee's custody is in their best interests. Thus, the trial court's judgment is not against the manifest weight of the evidence.

**{¶72}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

**{¶73}** In her second assignment of error, appellant asserts that the GAL failed to comply with Sup.R. 48.03 by failing to (1) contact appellant, (2) provide appellant with the GAL's contact information, (3) observe appellant with the children, (4) visit appellant's home, and (5) visit E.S. in his new placement. Appellant contends that, due to the GAL's purported failures, the trial court should not have permitted the GAL to offer a recommendation regarding the children's best interest. Appellant does recognize that trial counsel did not object during the trial court proceedings, but she asserts that the trial court plainly erred by relying "on testimony made by an individual that did not fulfill Rule 48 requirements" and "on

Scioto, 24CA4069

the conclusions of [the GAL's] report."

{¶74} It is well-settled that a party may not raise new issues or legal theories for the first time on appeal. *E.g., Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43 (1975). Thus, a litigant who fails to raise an argument before the trial court forfeits the right to raise that issue on appeal. *Independence v. Office of the Cuyahoga Cty. Executive*, 2014-Ohio-4650, ¶ 30 ("an appellant generally may not raise an argument on appeal that the appellant has not raised in the lower courts"); *State v. Quarterman*, 2014-Ohio-4034, ¶ 21 (defendant forfeited constitutional challenge by failing to raise it during trial court proceedings); *Gibson v. Meadow Gold Dairy*, 88 Ohio St.3d 201, 204 (2000) (party waived arguments for purposes of appeal when party failed to raise those arguments during trial court proceedings); *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177 (1992) (appellant cannot "present * * * new arguments for the first time on appeal"); *accord State ex rel. Jeffers v. Athens Cty. Commrs.*, 2016-Ohio-8119, fn.3 (4th Dist.) ("[i]t is well-settled that failure to raise an argument in the trial court results in waiver of the argument for purposes of appeal"); *State v. Anderson*, 2016-Ohio-2704, ¶ 24 (4th Dist.) ("arguments not

presented in the trial court are deemed to be waived and may not be raised for the first time on appeal").

**{¶75}** Appellate courts may, however, in certain circumstances, consider a forfeited argument using a plain-error analysis. *See Risner v. Ohio Dept. of Nat. Resources, Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 27 (reviewing court has discretion to consider forfeited constitutional challenges); *see also Hill v. Urbana*, 79 Ohio St.3d 130, 133-34 (1997), citing *In re M.D.*, 38 Ohio St.3d 149 (1988), syllabus ("[e]ven where [forfeiture] is clear, [appellate] court[s] reserve[] the right to consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it'"); *State v. Pyles*, 2015-Ohio-5594, ¶ 82 (7th Dist.), quoting *State v. Jones*, 2008-Ohio-1541, ¶ 65 (7th Dist.) (the plain error doctrine "'is a wholly discretionary doctrine'"); *DeVan v. Cuyahoga Cty. Bd. of Revision*, 2015-Ohio-4279, ¶ 9 (8th Dist.) (appellate court retains discretion to consider forfeited argument); *see Rosales-Mireles v. United States*, 585 U.S. 129, 135 (2018) (court has discretion whether to recognize plain error).

**{¶76}** For the plain error doctrine to apply, the party claiming error must establish (1) that "'an error, i.e., a

Scioto, 24CA4069

deviation from a legal rule" occurred, (2) that the error was "'an "obvious" defect in the trial proceedings,'" and (3) that this obvious error affected substantial rights, i.e., the error "'must have affected the outcome of the trial.'" *State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings."). For an error to be "plain" or "obvious," the error must be plain "under current law" "at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 467, 468 (1997); *accord Barnes*, 94 Ohio St.3d at 27; *State v. G.C.*, 2016-Ohio-717, ¶ 14 (10th Dist.).

{¶77} The plain error doctrine is not, however, readily invoked in civil cases. Instead, an appellate court "must proceed with the utmost caution" when applying the plain error doctrine in civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997). The Ohio Supreme Court has set a "very high standard" for invoking the plain error doctrine in a civil case. *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 375 (2000).

Thus, "the doctrine is sharply limited to the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, 79 Ohio St.3d at 122; *accord Jones v. Cleveland Clinic Found.*, 2020-Ohio-3780, ¶ 24; *Gable v. Gates Mills*, 2004-Ohio-5719, ¶ 43. Moreover, appellate courts "'should be hesitant to decide [forfeited errors] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination.'" *Risner*, 2015-Ohio-3731, at ¶ 28, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 332, fn. 2 (1983); *accord Mark v. Mellott Mfg. Co., Inc.*, 106 Ohio App.3d 571, 589 (4th Dist. 1995) ("Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process."). Additionally, "[t]he plain error doctrine should never be applied to reverse a civil judgment * * * to allow litigation of issues which could easily have been raised and determined in the initial trial." *Goldfuss*, 79 Ohio St.3d at 122.

**{¶78}** In the case sub judice, appellant did not object to

the GAL's alleged noncompliance with Sup.R. 48.03(D) at a time when the trial court could have corrected any error. Therefore, appellant forfeited the right to raise the issue on appeal. *See In re E.A.G.*, 2024-Ohio-315, ¶ 80 (4th Dist.). Furthermore, as we explain infra, any error that may have arguably occurred did not affect the outcome of the proceedings in the case at bar.

**{¶79}** A GAL's primary duty in a permanent custody proceeding is "to protect the interest of the child." R.C. 2151.281(B)(1); *accord In re C.B.*, 2011-Ohio-2899, ¶ 14 (a GAL's "purpose is to protect the interest of the child"). The GAL must "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services" that the agency provided the child, "and shall file any motions and other court papers that are in the best interest of the child." R.C. 2151.281(I). If the GAL fails "to faithfully discharge the guardian ad litem's duties," the court "shall discharge the guardian ad litem and appoint another guardian ad litem." R.C. 2151.281(D).

**{¶80}** Additionally, Sup.R. 48.03(D) contains a nonexhaustive listing of a GAL's duties:

> (1) Become informed about the facts of the case and contact all relevant persons;

(2) Observe the child with each parent, foster parent, guardian or physical custodian;

(3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;

(4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;

(5) Ascertain the wishes and concerns of the child;

(6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.

(7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;

(8) Review pleadings and other relevant court documents in the case;

(9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

**{¶81}** Appellant asserts that the GAL failed to comply with Sup.R. 48.03(D) by failing to (1) observe appellant in her home environment, (2) give appellant the GAL's contact information, and (3) contact appellant. She further contends that the GAL

Scioto, 24CA4069

"recommended one of the [c]hildren be placed in a home that she had never visited and never seen the child in."

{¶82} However, even if some of appellant's assertions are arguably correct, this court, along with other Ohio appellate courts, has refused to recognize purported Sup.R. 48.03(D) violations as reversible error. *In re A.A.*, 2024-Ohio-224, ¶ 50 (10th Dist.); *In re S.W.*, 2023-Ohio-793, ¶ 45 (4th Dist.); *see In re K.L.*, 2021-Ohio-3080, ¶ 63 (11th Dist.) ("the failure to comply with the Rules of Superintendence, even if a technical error, is not reversible"); *In re E.W.*, 2011-Ohio-2123, ¶ 12 (4th Dist.) (superintendence rules are internal housekeeping rules that do not create any substantive rights); *Pettit v. Pettit*, 2012-Ohio-1801, ¶ 12 (12th Dist.) (superintendence rules are "administrative directives only, and are not intended to function as rules of practice and procedure"); *see also State ex rel. Parker Bey v. Byrd*, 2020-Ohio-2766, ¶ 41, quoting *State v. Singer*, 50 Ohio St.2d 103, 110 (1977) ("'[t]he Rules of Superintendence are not designed to alter basic substantive rights'") (Kennedy, J., concurring in part and dissenting in part). Therefore, even if the GAL failed to comply with some of the duties listed in Sup.R. 48.03(D), the failure to comply with this superintendence rule does not constitute reversible error.

**{¶83}** Additionally, appellant did not argue that any purported failure to comply with Sup.R. 48.03(D) affected the outcome of the proceedings.  Rather, she contends that the trial court should have excluded the GAL's recommendation.  Even without the GAL's recommendation, however, we believe that the evidence we outlined above shows that placing the children in appellee's permanent custody is in their best interests.  Consequently, appellant cannot establish that this case is one of the extremely rare cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, 79 Ohio St.3d at 122.

**{¶84}** Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellants the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.