[Cite as *In re X.P.*, 2026-Ohio-1221.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| IN RE: X.P. | : | CASE NO. 25CA4145 |
|     I.R. | | |
| | : | |
| Adjudicated Neglected/ | | DECISION & JUDGMENT ENTRY |
|  Dependent Children. | : | |
| | | |
| | : | |

_____

APPEARANCES:

Richard D. Hixson, Zanesville, Ohio, for appellant.

Shane A. Tieman, Scioto County Prosecuting Attorney, and
Elisabeth M. Howard, Assistant Scioto County Prosecuting
Attorney, Portsmouth, Ohio, for appellee.
_____
CIVIL APPEAL FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:3-25-26
ABELE, J.

{¶1} This is an appeal from a Scioto County Common Pleas Court, Juvenile Division, judgment that granted Scioto County Children Services, appellee herein, permanent custody of 13-year-old X.P. and 4-year-old I.R.

{¶2} Appellant, T.R., the children's biological mother, assigns the following error for review:

> "THE TRIAL COURT ERRED AND ABUSED ITS
> DISCRETION IN FINDING BY CLEAR AND
> CONVINCING EVIDENCE THAT IT WOULD BE IN THE
> BEST INTERESTS OF THE MINOR CHILDREN TO
> PERMANENTLY TERMINATE THE PARENTAL RIGHTS OF
> THEIR PARENTS AND PLACE THEM IN THE
> PERMANENT CUSTODY OF THE AGENCY."

{¶3} In October 2021, appellee received a referral that appellant had been arrested for shoplifting and admitted that she recently used "ice." At the time of her arrest, X.P. had been with appellant, and I.R. had been at home with the putative father, L.R. When a caseworker subsequently visited the home to check on I.R., L.R. consented to a drug screen and tested positive for methamphetamine, oxycodone, benzodiazepine, and buprenorphine.

{¶4} Shortly thereafter, appellee filed a complaint that alleged the children to be "neglected/dependent." Appellee requested an ex parte order to place the children in its temporary custody pending adjudication and disposition, and further requested temporary custody of the children. The trial court subsequently granted appellee emergency, temporary custody of the children.

{¶5} On January 14, 2022, the trial court adjudicated the children "neglected/dependent," and, on January 26, 2022, the court entered a dispositional order that placed the children in appellee's temporary custody.

{¶6} A short time later, the parties learned that L.R. is not I.R.'s biological father. Appellant instead believed that another man, D.T., is I.R.'s father. She later advised D.T. of her suspicion. Additionally, on April 28, 2022, appellant filed a motion that asked the court to order D.T. to undergo genetic

testing to determine if he is I.R.'s biological father.  On June 3, 2022, the court granted this motion.

{¶7} More than one year later, on October 6, 2023, the trial court entered a nunc pro tunc order to correct "a clerical error" in its June 3, 2022 order.  The court stated that its previous entry "failed to detail the needed participation of all parties with the Scioto County Child Support Enforcement Agency (CSEA) to complete [the genetic] testing."

{¶8} In January 2024, D.T. obtained a DNA test, which later confirmed that he is I.R.'s biological father.

{¶9} On February 23, 2024, appellee filed a motion that asked the trial court to modify the disposition to permanent custody.  Appellee alleged that the children had been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing the children in its permanent custody would be in their best interest.

{¶10} On July 16, 2024, the trial court held a hearing to consider appellee's permanent custody motion.  At the hearing, the family's caseworker, Timothy Secoy, testified that after the children entered appellee's temporary custody, appellee developed a case plan that required appellant to (1) obtain an alcohol and drug assessment and follow any treatment recommendations, (2) obtain a mental health assessment and follow any treatment recommendations, (3) submit to random drug

screens, and (4) complete parenting classes.  Appellant entered

some drug treatment programs, but she did not remain drug-free.

{¶11} The evidence reveals that appellant consistently

visited the children and interacted appropriately with them

during the visits.  Appellee later offered appellant extended

visits and, eventually, unsupervised visits.  During the period

of unsupervised visits, appellant unfortunately relapsed.  Thus,

the visits returned to supervised visits at the agency.[1]

{¶12} At the time of the permanent custody hearing,

appellant did not have independent housing, but instead lived

with her parents.  Secoy indicated that appellant's parents

would not be appropriate caregivers for the children, but he did

not recall the reason appellee deemed appellant's parents

inappropriate.  Secoy stated that he had not been able to locate

the records.

{¶13} Secoy next explained D.T.'s involvement in the case.

In June 2022, D.T. contacted Secoy to state that he believed

that he is I.R.'s biological father.  Secoy met with D.T. in

July 2022, and gave him paperwork to complete a drug screen and

a background check.  Secoy also advised D.T. to complete

parenting classes.  He further informed D.T. that "if he wanted

to become involved in the case that he needed to come down here

---

[1] Secoy could not recall the dates when appellant had unsupervised visits with the children or when she relapsed.

to Juvenile Court, request an attorney, as well as go get a DNA test."

{¶14} In August 2022, D.T. dropped off a certificate that stated that he had completed parenting classes.  Secoy did not have any further contact with D.T. until June 27, 2023, when D.T. next contacted him.

{¶15} In July 2023, Secoy visited D.T.'s home to perform a safety audit.  Secoy stated that D.T. had been remodeling the home, but the home otherwise appeared to be free of safety hazards.  Secoy asked D.T. to resolve the few safety hazards that the remodeling posed and to obtain bedding for I.R.'s room. When Secoy returned to the home, D.T. had resolved the safety issues.

{¶16} Beginning in October 2023, appellee offered supervised visits between I.R. and D.T. that occurred during the same time as appellant's visits.  D.T. regularly attended the visits until May 2024, when "he was in the potential jeopardy of losing his job."

{¶17} In June 2024, D.T. asked about having a weekend visit with I.R. or scheduling a different time to visit the child. Secoy informed D.T. that appellee "would not be moving forward with expanding visitations," given that appellee had filed a permanent custody motion.

{¶18} Appellee did not seek to place I.R. with D.T. due to D.T.'s approximately one-year delay in following Secoy's instructions to become involved in the case, such as obtaining a DNA test.  Secoy further stated that D.T.'s interaction with I.R. was "very hit and miss."  He explained that D.T. "[s]ometimes [was] attentive" to I.R., but "other times," he was "very standoffish" and did not seem to "know how to appropriately interact."  Secoy did not observe any bond between I.R. and D.T.

{¶19} Secoy also explained that both children are doing well in their respective foster homes.  I.R. has been with the same foster family since the end of October 2021, when he was about 14 months of age.  I.R. is bonded with his foster family and refers to the foster parents as "mom" and "dad."  I.R. also interacts well with the other children in the home.

{¶20} After Secoy's testimony, the court continued the hearing until January 3, 2025.

{¶21} When the hearing resumed, I.R.'s foster mother testified that the child is doing well in her home and that she and her husband would be willing to adopt the child if the trial court were to grant appellee permanent custody.

{¶22} Margaret McCue testified that she is a behavioral health therapist and counseled both children.  McCue indicated that X.P. is doing well in the foster home, appears "very

happy," and shares a bond with the foster providers.  McCue

stated that X.P. does not speak favorably about appellant.  X.P.

informed McCue that he would like to remain in the foster home

and be adopted.

{¶23} McCue reported that I.R. has "[s]evere ADHD" and

"difficulty regulating his emotions."  She has been helping him

learn some techniques to help him better regulate his emotions.

{¶24} McCue indicated that I.R. interacts well with the

foster family.  She believes that I.R. thinks of "his foster

parents as his parents."  When she has spoken with I.R. about

his visits, he "talks about [X.P.] more than anything."  McCue

stated that I.R. did not mention appellant.  After McCue's

testimony, appellee rested.

{¶25} D.T. presented testimony from his 18-year-old daughter

who stated that D.T. obtained custody of her when she was around

10 or 11 years of age, and she lived with him until she

completed high school.  The daughter reported that D.T. was a

great father and provided for all of her needs.

{¶26} The daughter additionally indicated that she

interacted with both X.P. and I.R. until appellee removed them

from appellant's home.  She stated that she was with I.R. "all

the time" "until he was like one."  The daughter further

asserted that, after appellee removed I.R. from appellant's

home, she and D.T. visited I.R. when I.R. had visits at

appellant's home.  The daughter testified that D.T. helped I.R. with anything that the child needed or wanted.  She further related her belief that D.T. could care for I.R.

{¶27} D.T. testified that he and appellant were in a relationship until December 2019.  A month or two later, he heard that appellant was pregnant.  D.T. asked appellant about the pregnancy, and she "swore up and down" that the baby was not his baby.  He nevertheless thought that I.R. might be his child.

{¶28} In April 2022, appellant told D.T. that he was I.R.'s father.  D.T. informed appellant that he "pretty much already knew" and "was just waiting for it to come out."  D.T. explained that because he and appellant ended their relationship in December 2019, he suspected that I.R., who was born in August 2020, is his child.

{¶29} In October 2023, D.T. started to have supervised visits with I.R.  Before then, he visited I.R. when I.R. had visits at appellant's home.

{¶30} When on cross-examination appellee's counsel asked D.T. why he did not more vigorously pursue custody of I.R. after D.T. learned in April 2022 that he likely was the child's father, D.T. explained that he thought that he needed "to go through the proper procedures" to see I.R.  D.T. agreed, however, that, after he first contacted Secoy in June 2022, he did not again contact Secoy to inquire about the status of the

case until June 2023.

{¶31} The children's guardian ad litem (GAL) testified and recommended that the court place the children in appellee's permanent custody. She observed both children in their foster homes and stated that both "are thriving." X.P. had informed her that he would like to remain living with his foster family.

{¶32} The GAL expressed concerns about D.T.'s lack of follow-through once he learned that he is I.R.'s father. She further indicated that D.T. "knew at conception that [I.R.] could have been his child." The GAL believed that D.T. could have been "more aggressive in making things happen to see his son." The GAL thought that D.T. had missed "very formative years" with I.R.

{¶33} On July 9, 2025, the trial court granted appellee permanent custody of the two children. The court found that the children had been in appellee's temporary custody for 12 or more months of a consecutive 22-month period and that placing them in appellee's permanent custody is in their best interest. The court noted that the children had been in appellee's continuous, temporary custody for more than two years and that neither parent appeared to dispute this fact.

{¶34} Regarding the parents' involvement in the case, the trial court found that, although appellant attempted to obtain treatment for her substance abuse, she continued to test

positive for methamphetamines, amphetamines, oxycodone, buprenorphine, and THC. The court additionally noted that appellant failed to maintain suitable housing or stable employment.

{¶35} The trial court observed that, in June 2022, D.T. contacted appellee to ask about becoming involved in the case. At that time, the caseworker spoke with D.T. and gave him instructions so that appellee could add him as a party to the case. The caseworker did not, however, hear from D.T. until about one year later, on June 27, 2023. Shortly thereafter, the caseworker visited D.T.'s home for a safety audit. The audit indicated that some minor repairs needed to be made. After D.T. made the repairs, appellee started the process to begin visits between D.T. and I.R.

{¶36} The trial court determined that D.T. "was aware of this case and the needs of I.R. He just ignored them until permanent custody became an issue." The court stated that D.T. "knew there was a possibility that I.R. was his biological son because [he] had contact with [appellant] and the minor child informally before I.R. was removed."

{¶37} With respect to the children's interactions and interrelationships, the trial court observed that X.P. "reported that he feels loved in his current home." X.P. additionally informed his counselor "that it's too late for [appellant]; that

she has just begun to show love and bring him gifts."

{¶38} The trial court also considered I.R.'s interactions and interrelationships.  The court first reviewed the testimony regarding I.R.'s interaction and interrelationship with his father, D.T.  The court noted that the caseworker testified that I.R. had not developed a sufficient bond with D.T.  The court further observed that (1) on October 23, 2023, D.T. had his first visit with I.R., (2) over the next year, D.T.'s visits with the child "were sporadic," and (3) as of July 16, 2024, D.T. had attended about eight visits with the child.

{¶39} The trial court next considered the child's interaction and interrelationship with the foster family.  The court pointed out that I.R.'s foster mother stated that the child has been placed in her home since the end of October 2021. The court found that the child "has flourished" while in the foster home and "has a strong bond with her husband and her mother."  The court also indicated that the foster mother "shares a strong and loving bond with the minor child."  The court additionally recognized that I.R.'s therapist likewise testified that he had a strong bond with the foster parents.

{¶40} The trial court next considered the children's wishes. The court observed that X.P.'s counselor testified that the child wished to remain with his current care providers.  The court further noted that the children's GAL recommended that the

court place the children in appellee's permanent custody.

{¶41} The trial court additionally reviewed the children's custodial history and observed that the children have been in appellee's temporary custody for 12 or more months of a consecutive 22-month period.

{¶42} The trial court also determined that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting appellee permanent custody.  The court found the following facts supported its conclusion:  (1) appellant failed to complete substance abuse treatment and failed to maintain sobriety; (2) D.T. "has failed to build a meaningful bond with [I.R.]"; and (3) the "children have stabilized" while living with the foster families.

{¶43} The trial court concluded that "[l]eaving these children in a state of uncertainty is contrary to their best interests."  The court emphasized that the children had been in foster care for an "extensive length of time" and have developed "evident bond[s] with their foster families."  The court thus determined that placing the children in appellee's permanent custody would serve their best interest and granted appellee permanent custody of the children.  This appeal followed.

{¶44} In her sole assignment of error, appellant asserts that clear and convincing evidence does not support the trial

court's permanent custody judgment. Specifically, appellant

contends that clear and convincing evidence does not support the

trial court's conclusion that placing the children in appellee's

permanent custody is in their best interest.

                                   A

{¶45} Generally, a reviewing court will not disturb a trial

court's permanent custody decision unless the decision is

against the manifest weight of the evidence.[2] *E.g., In re B.E.*,

2014-Ohio-3178, ¶ 27 (4th Dist.); *In re R.S.*, 2013-Ohio-5569, ¶

29 (4th Dist.); *accord In re Z.C.*, 2023-Ohio-4703, ¶ 1.

> "Weight of the evidence concerns 'the inclination of the
> greater amount of credible evidence, offered in a trial,
> to support one side of the issue rather than the other.
> It indicates clearly to the jury that the party having
> the burden of proof will be entitled to their verdict,
> if, on weighing the evidence in their minds, they shall
> find the greater amount of credible evidence sustains
> the issue which is to be established before them. Weight
> is not a question of mathematics, but depends on its
> effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v.*

*Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law*

*Dictionary* 1594 (6th Ed.1990).

{¶46} When an appellate court reviews whether a trial

---

[2] We observe that appellant's assignment of error states that the court "abused its discretion" when it determined that placing the children in appellee's permanent custody would serve their best interest. As we have noted in the past, however, the abuse-of-discretion standard of review does not apply to an appellate court's review of a trial court's permanent custody judgment. *See In re B.S.*, 2024-Ohio-5183, ¶ 38 (4th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 18.

court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *Eastley*, 2012-Ohio-2179, at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord In re Pittman*, 2002-Ohio-2208, ¶ 23-24 (9th Dist.). We further observe, however, that issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

{¶47} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio

St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

{¶48} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings . . . were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43.

{¶49} "Clear and convincing evidence" is

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-

43 (1986); *compare In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

{¶50} Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence.  *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *see also In re R.L.*, 2012-Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9 (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements . . . have been established.' ").

{¶51} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"

*Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.  A reviewing court should find a trial court's permanent custody judgment against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"  *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *see Black's* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

B

{¶52} Courts must recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e United States Supreme] Court.'"  *B.C.*, 2014-Ohio-4558, at ¶ 19, quoting *Troxel*, 530 U.S. at 65.  Indeed, "the right to raise one's children is an 'essential' and 'basic' civil right."  *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *accord In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("natural parents have a fundamental right to the care and custody of their children").  Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children."  *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d

89, 97 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

{¶53} A parent's rights, however, are not absolute. *In re D.A.*, 2007-Ohio-1105, ¶ 11. Rather, "'it is plain that the natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

{¶54} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C.

2151.01(A).

C

{¶55} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, appellee sought permanent custody by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶56} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that, as relevant in the case sub judice, "[t]he child has been in the temporary custody of one or more public children services agencies . . . for twelve or more months of a consecutive twenty-two-month period . . . ." R.C. 2151.414(B)(1)(d).

{¶57} In the case sub judice, the trial court found that the children had been in appellee's temporary custody for 12 or more months of a consecutive 22-month period. Appellant does not dispute this finding on appeal. Instead, she agrees that the children have been in appellee's temporary custody for 12 or

more months of a consecutive 22-month period.  We therefore do not address this factor.  Appellant does not agree, however, that placing the children in appellee's permanent custody is in their best interest.

{¶58} R.C. 2151.414(D) lists the factors that a trial court considers when determining whether permanent custody will serve a child's best interest.  The statute directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody.  The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶59} Courts that must determine whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best

interest] factors," as well as the "five enumerated statutory factors."  *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297,¶ 19 (10th Dist.). However, none of the best interest factors is entitled to "greater weight or heightened significance."  *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination.  *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.).  In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security."  *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).  Indeed, "'[t]here is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.'"  *In re B.C.*, 2014-Ohio-4558, ¶ 20, quoting *Lehman v. Lycoming Cty. Children's Servs. Agency,* 458 U.S. 502, 513-14 (1982).

{¶60} In the case sub judice, appellant contends that the best interest factors do not weigh in favor of placing the children in appellee's permanent custody.  Appellant first argues that she and the children shared positive interactions

and interrelationships.  She contends that the children are bonded to her and that she consistently attended visits with the children.  Appellant also asserts that she completed multiple substance abuse assessments and attended inpatient treatment.  She points out that she even made sufficient progress to allow unsupervised visits with the children.

{¶61} Appellant additionally claims that the children could have achieved a legally secure permanent placement without granting appellee permanent custody.  She states that I.R.'s father or appellant's parents could have provided the children with a legally secure permanent placement.

{¶62} As we explain below, we do not agree with appellant that the trial court's best interest determination is against the manifest weight of the evidence.

Children's Interactions and Interrelationships

{¶63} The evidence indicates that appellant interacted appropriately with the children during supervised visits.  The older child, however, stated that he does not want to live with appellant.  His statement suggests that he does not share a positive relationship with appellant.

{¶64} On the other hand, both children appear to share positive relationships with their foster families.  The children's therapist indicated that they both are doing well in the foster homes.  Additionally, I.R.'s foster mother testified

that the child is bonded to her and to the remaining members of the family.

{¶65} I.R.'s father visited the child, but the caseworker described the father's interaction with the child as detached and disengaged. Furthermore, the trial court noted that I.R.'s father allowed nearly one year to elapse before taking concrete steps to be involved in the child's case.

### Children's Wishes

{¶66} The older child was able to directly express his wishes and stated that he did not want to live with appellant. The GAL recommended that the court place both children in the agency's permanent custody. *See C.F.*, 2007-Ohio-1104, at ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.*, 2014-Ohio-2961, ¶ 32 (4th Dist.) (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as child directly expresses or through the GAL).

### Custodial History

{¶67} X.P. and I.R. lived with appellant until their October 2021 removal. Since that time, they have remained in appellee's temporary custody. Thus, when appellee filed its February 2024 permanent custody motion, the children had been in its temporary custody for more than two years. We further note that, at the

time of the January 2025 hearing, the children had been in appellee's temporary custody for more than three years. *See* R.C. 2151.415(D)(4) (prohibiting a court from continuing "an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier"); *see also In re Adams*, 2007-Ohio-4840, ¶ 22 ("no more than two extensions of a temporary-custody order may be given").

Legally Secure Permanent Placement

**{¶68}** "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (legally secure permanent placement requires more than a stable home and income, but also requires an environment that will provide for a child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (mother was unable to provide legally secure permanent placement when she lacked physical and emotional stability and father was unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th

Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent"); *Black's* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient").  Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.*, 2016-Ohio-793, at ¶ 56 (4th Dist.).

{¶69} In the case at bar, we believe that the evidence presented at the hearing supports the trial court's finding that the children need a legally secure permanent placement and that appellant cannot provide the children with a legally secure permanent placement.  Appellant did not have independent housing and had not maintained sobriety.  Thus, she could not provide the children with a legally secure permanent placement.

{¶70} Furthermore, even though appellant may have engaged in some of the case plan services, case plan compliance is not necessarily dispositive on the issue of reunification and does

not preclude a grant of permanent custody to a children's services agency. *In re W.C.J.*, 2014-Ohio-5841, ¶ 46 (4th Dist.) ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency."); *see In re M.H.*, 2017-Ohio-7365, ¶ 102 (4th Dist.); *In re S.S.*, 2017-Ohio-2938, ¶ 164 (4th Dist.); *In re M.B.*, 2016-Ohio-793, ¶ 59 (4th Dist.); *In re N.L.*, 2015-Ohio-4165, ¶ 35 (9th Dist.) ("substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"); *In re S.C.*, 2015-Ohio-2280, ¶ 40 (8th Dist.) ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); *In re West*, 2003-Ohio-6299, ¶ 19 (4th Dist.). Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, "it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights." *In re Gomer,* 2004-Ohio-1723, ¶ 36 (3d Dist.); *accord In re A.S.*, 2014-Ohio-3035, ¶ 32 (8th Dist.). Consequently, even if appellant partially complied with some of the case plan services, her partial compliance did not preclude the trial court from concluding that placing the children in appellee's permanent custody would serve the children's best interest.

{¶71} Regarding appellant's assertion that her parents could have provided the children with a legally secure permanent placement, we observe that, at the time of the permanent custody hearing, appellant lived with her parents. Additionally, appellee had not approved placing the children with appellant's parents. Although appellee did not present evidence during the permanent custody hearing to explain why appellant's parents were not approved, testimony presented at an October 2023 review hearing indicates that appellant's parents tested positive for illegal drugs. Thus, the evidence does not suggest that appellant's parents would be able to provide the children with a legally secure permanent placement.

{¶72} Moreover, even if I.R.'s father had a legally secure permanent placement for I.R., the trial court was not required to conclude that any ability that the father had to provide the child with a legally secure permanent placement meant that denying appellee's permanent custody motion would serve the child's best interest. As the trial court recognized, I.R., who was about 14 months of age at the time of his removal, spent more than two years living with the same foster family. Thus, the child has spent the majority of his young life with the foster family. Moreover, the child has developed a bond with the foster family, and the trial court rationally could have determined that uprooting the child from the foster home would

not be in the child's best interest.  We further observe that, even if I.R.'s father could provide I.R. with a legally secure permanent placement, the trial court was not required to weigh this factor more heavily than the remaining best interest factors.  *See C.F.*, 2007-Ohio-1104, at ¶ 57 (none of the best interest factors is entitled to "greater weight or heightened significance").

### R.C. 2151.414(E)(7) to (11)

{¶73} R.C. 2151.414(D)(1)(e) requires a trial court to consider whether any of the factors listed in R.C. 2151.414(E)(7) through (11) apply.  Those provisions list parental conduct that may lead a court to conclude that placing a child in a children services agency's permanent custody would be in a child's best interest.  The parental conduct listed in R.C. 2151.414(E)(7) through (11) includes situations in which the parent (1) had been convicted of or pleaded guilty to certain criminal offenses against the child, the child's sibling, or another child who lived in the parent's household, (2) withheld medical treatment or food from the child, (3) repeatedly placed the child at substantial risk of harm because of alcohol or drug abuse, (4) abandoned the child, or (5) had parental rights involuntarily terminated with respect to a sibling of the child.

{¶74} In the case sub judice, the trial court found that X.P.'s father had abandoned him, but the court did not make any R.C. 2151.414(E)(7) through (11) finding with respect to appellant.

{¶75} Based upon all of the foregoing factors, we believe that the trial court could have formed a firm belief that placing the children in appellee's permanent custody is in their best interest. We therefore do not believe that the trial court's conclusion that the children's best interest would be served by placing them in appellee's permanent custody is against the manifest weight of the evidence.

{¶76} Accordingly, based upon the foregoing reasons, we overrule appellant's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.